**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**White Plains Division**

| | | |
|---|---|---|
| ANNETTE BROOKS,<br><br>*Plaintiff*,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>*Defendant*. | ) | Civil Action No.: 26-CV-3664<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Annette Brooks (hereinafter "Plaintiff"), by and through undersigned counsel, files this complaint against her former employer, International Business Machines Corporation (hereinafter "Defendant" or "IBM"):and alleges as follows

## INTRODUCTION

1. Plaintiff was employed by Defendant as Vice President, IBM Z Data and AI. She worked for IBM for twenty-six (26) years, receiving strong reviews and increased responsibilities over the years. Plaintiff maintained professional and effective relationships with management and the teams under her supervision, and over the course of her tenure was entrusted with increased responsibilities and multiple promotions. Plaintiff was one of seven Black executives in her organization of 20,000 employees, five of whom were laid off in the January 2025 round of terminations. She was one of three Black Vice Presidents, all of whom were terminated at the same time. Plaintiff's termination, and replacement with a South Asian employee, occurred in the

context of consistent preferential treatment of South Asian employees over Black employees within IBM.

2. For the reasons developed herein, Defendant has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter "Title VII"), and the Civil Rights Act of 1899, 42 U.S.C. § 1981 (hereinafter "Section 1981"). As a direct and proximate cause of Defendant's unlawful actions, Plaintiff has suffered financial losses, as well as mental and emotional pain, and reputational damage. She now seeks compensation of not less than $1,150,000.00, as well as costs, attorney's fees and interest, and any other remedies deemed appropriate by the Court.

## PARTIES

3. Plaintiff is an African American woman who is a resident of the state of New York.

4. Defendant is an international corporation that does substantial business in the state of New York via its operations located at 1 New Orchard Road, Armonk, New York 10504-1722 and meets the minimum contacts requirements for this Court to exercise jurisdiction over this employment dispute.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. §1331 and 42 U.S.C. § 1983, this Court has subject matter jurisdiction over the dispute herein because the claims are brought pursuant to the laws of the United States.

6. This Court is the proper venue because the dispute between the parties arose in this jurisdiction, Plaintiff worked within the state of New York, and Plaintiff's employment records were housed in the office located in New York.

## ADMINISTRATIVE EXHAUSTION

7. Plaintiff was terminated from her employment with IBM on February 24, 2025.[1]

On or about August 6, 2025, Plaintiff filed EEOC charge 520-2025-07709, in which she alleged that her termination was discriminatory based on her race, and more specifically, that IBM favored South Asian employees over African American employees in the restructuring that lead to her termination. *See* EXHIBIT **1**.

8. On or about February 4, 2026, the EEOC issued the Notice of Right to Sue in this case. *See* EXHIBIT **2**.[2]

9. Plaintiff timely files the instant lawsuit and has fully exhausted her administrative remedies.

## RELEVANT FACTS

### PLAINTIFF'S BACKGROUND AND QUALIFICATIONS

10. Plaintiff holds a Bachelor of Science Degree in Computer Science from Alabama State University, that she earned in 1998.

11. She also has a master's degree in business administration from PACE University that she earned in 2003.

12. Plaintiff first started working for Defendant in July of 1998 and remained employed with IBM until she was terminated on February 24, 2025.

13. Prior to her termination, Plaintiff was one of seven African American executive employees in her division. There were only three (3) African American vice presidents in the division, of which Plaintiff was one.

14. In early 2020, Plaintiff began working under Dinesh Nirmal (hereinafter "Mr.

[1] Under New York law, Plaintiff had until December 21, 2025 (300 days) to file her EEOC charge.
[2] EEOC sent the NRTS to Plaintiff via counsel on February 12, 2026. *See* EXHIBIT **3**.

Nirmal"), then General Manager of IBM Data, AI, and Automation.

15. Mr. Nirmal was promoted to Senior Vice President in January 2023, and in 2024 Plaintiff took on a new title and reporting structure: in her new role as Vice President, IBM Z Data & AI, she reported to Vice President of IBM Z Software, Skyla Loomis (hereinafter "Ms. Loomis"), who in turn reported to Mr. Nirmal, now Vice President of Software.

16. IBM Z is the business line that develops software for IBM customers, who are often large enterprises such as banks, insurance companies, and large retail companies.

17. Plaintiff led the development organization for Db2, which is a relational database management system widely used by large enterprise customers.

18. She also oversaw the software design team for all of Z software.

19. In the end of 2024, Plaintiff started to hear rumors that IBM was planning to restructure the business line. However, such restructurings have happened many times during her tenure and never resulted in large numbers of Black executives being fired.

**IBM'S PREFERENTIAL TREATMENT OF SOUTH ASIAN EMPLOYEES**

20. Working under Mr. Nirmal represented a major shift in Plaintiff's experience at IBM. From the beginning of her time working under Mr. Nirmal, a man of South Asian descent, Plaintiff noted his favoritism toward her South Asian colleagues.

21. At the time of her termination, eight of Mr. Nirmal's ten direct reports were of South Asian descent, and he showed a clear personal preference for South Asian employees throughout his organization.

22. Most IBM employees not of South Asian descent, including Plaintiff, found Mr. Nirmal to be difficult to effectively connect and communicate with, and accordingly struggled to form a strong professional relationship with him.

23. In contrast, Mr. Nirmal invited and convened with South Asian IBM employees outside of work, allowing these colleagues critical networking and relationship-building opportunities that were not extended or otherwise made available to non-South Asian employees such as Plaintiff.

24. Mr. Nirmal's bias was so conspicuous that Plaintiff and her colleagues speculated that his two non-South Asian direct reports should be concerned about the future of their jobs.

**DISPARATE TREATMENT OF PLAINTIFF**

25. Plaintiff was a consistent strong performer, who was never placed on any kind of performance improvement plan or given written feedback that her performance was unsatisfactory.

26. However, Plaintiff had a white male colleague Kyle Charlet (hereinafter "Mr. Charlet"), who was an IBM fellow. Mr. Charlet, who was responsible for the technical side of the business, was a similarly situated peer of Plaintiff.

27. In December of 2024, Mr. Charlet accused Plaintiff's team of moving too slow in a group "Slack" chat.

28. In that Slack chat, Mr. Charlet accused Plaintiff's team of not moving with "speed and urgency."

29. However, after inquiring into the issue, Plaintiff established that the team that was causing the hold-up of the project did not report to her at all, but reported to another white male colleague, Andy Bradfield (hereinafter "Mr. Bradfield") (white male).

30. Mr. Bradfield was not chastised for how slow his team was moving. In fact, it was only a "problem" when Mr. Charlet and Ms. Loomis believed they could blame Plaintiff for the delay.

31. As an executive, Plaintiff was eligible for an annual incentive payment, in the form

of merit-based bonus on which Mr. Nirmal would have had some input.

32. During the bonus payout in 2024, Plaintiff learned that her own direct report, Rupa Bhaghavan—a woman of South Asian descent—had received a more generous bonus than she herself had.

33. Ms. Bhaghavan's performance did not merit such a significant bonus. Throughout 2023, Plaintiff had held many discussions with Ms. Bhaghavan about her performance discrepancies and needed areas of growth, and Plaintiff's direct manager routinely directed Plaintiff to address Ms. Bhaghavan's performance issues.

34. There were multiple conversations about areas in which Ms. Bhaghavan could improve. At the time of bonus payout, however, Ms. Bhaghavan received approximately 100% bonus payout, along with a significant level of stock, while Plaintiff received only 55% and a low stock award.

35. This bonus payout situation further demonstrated that Mr. Nirmal's favoritism to South Asian employees, as he was the principal decision-maker in bonus distribution.

**DEFENDANT'S STATED INTENTION TO APPEASE THE TRUMP ADMINISTRATION'S DEMAND TO ELIMINATE "DEI" HIRES, WHICH DISPROPORTIONATELY HARMED BLACK WOMEN**

36. In November of 2024, the presidential election occurred, and the newly elected administration vowed to insist that private companies abandon diversity, equity, and inclusion initiatives.

37. During a regularly scheduled question session held by IBM's CEO Arvind Krishan (hereinafter "Mr. Krishnan") who is also South Asian, answered a question asked about IBM's posture with respect to the Trump administration's directives on DEI, stated "of course we will comply," or words to the effect.

38. While IBM has made no other public statements about abandoning DEI, shortly after the inauguration of the Trump administration, and the dissemination of Executive Orders on reversing DEI efforts, an inexplicable exodus of Black senior executives occurred at IBM, which included Plaintiff.

39. Less than a month after the Trump administration's very public and emphatic directives on DEI, Defendant terminated five of seven African American executives, and all three Black Vice Presidents.

40. This was in concert with several other large private and public entities that also did the same, which had a disproportionately negative impact on African American female employees.

41. The purge of Black women from public and private jobs shortly after the inauguration has been well documented and studied. *See e.g.*, https://www.youtube.com/watch?v=SxvBbm2XrxI ; https://www.theguardian.com/us-news/2025/sep/20/black-women-trump-federal-layoffs; https://www.propublica.org/article/trump-dei-black-women-minorities-careers-jobs-dismissed; https://www.thenation.com/article/society/trump-economy-black-women/ .

42. Plaintiff asserts that in order to appease the Trump administration, and to remain favored by the Defense Department and other government agencies with large IBM contracts, Defendant removed several high profile African American employees, despite the fact that there was no performance-based reason to terminate their employment.

43. Moreover, in several instances, including with Plaintiff, African American female executives were replaced by less qualified South Asian employees.

**IBM'S 2025 "RESTRUCTURING" AND TERMINATION OF PLAINTIFF**

44. In early January 2025, IBM underwent a second major reorganization involving

significant layoffs.

45. During the early stages of this reorganization, Plaintiff learned from Ms. Loomis that then-Vice President of Product Management and Data Management Minaz Merali, a woman of South Asian descent, would now join Plaintiff's team and also report to Ms. Loomis.

46. Plaintiff was surprised by this shift: It was unclear what Ms. Merali's responsibilities would be in her new role, given the fact that the majority of Ms. Merali's prior team and many of her responsibilities had been reallocated to other employees and her remaining responsibility was leadership of a small product management team that worked directly with Plaintiff's significantly larger engineering team. It soon became clear that Ms. Merali would simply be stepping into Plaintiff's role.

47. On January 21, 2025, IBM informed Ms. Brooks of her termination.

48. First, Ms. Loomis told Plaintiff that her role had been eliminated; she then followed this up with an email reiterating that the termination was due to "workforce reduction."

49. But on January 29, 2025, in an announcement to the organization, Ms. Loomis revealed that Plaintiff's role had in fact not been eliminated—rather, Ms. Merali had been named the new Vice President of IBM Z Data & AI and had replaced Plaintiff.

**DEFENDANT'S POST-RESTRUCTURING ACTIONS REVEAL A PATTERN OF RACIAL BIAS**

50. During Plaintiff's exit interview, Ms. Loomis referenced performance concerns despite the fact that IBM indicated that Plaintiff's termination was not performance-based, underscoring the pretextual nature of the reasons offered for the termination.

51. Moreover, as a seasoned manager and executive, Plaintiff was aware that standard IBM procedure involved flagging "low performers" in IBM's internal systems and giving them a performance improvement plan before taking the drastic step of termination—but she was never

flagged as a low performer or given a performance improvement plan.

52. In fact, throughout her 26-year tenure at IBM, Plaintiff had always excelled in her performance. She received merit-based bonuses, ranging from 53% to 106% of her base salary, every year that she was eligible for as an executive.

53. As a vice president, she consistently drove her team to deliver projects faster than expected and ensured a level of quality that won her team technical awards from IBM leadership.

54. And as recently as October 2024, Ms. Loomis had indicated to General Manager Kelvin Hawkins, who sought to recruit Plaintiff to his organization, that Plaintiff was unavailable because she was needed where she was.

55. Just three months before her termination, Plaintiff's performance had apparently made her indispensable to Ms. Loomis.

56. Thus, Ms. Loomis's later comments disparaging Plaintiff's performance were clear pretext for a racially discriminatory termination.

57. The true nature of Plaintiff's termination becomes evident in the broader context of IBM's disparate treatment of Black employees relative to South Asian employees.

58. Unlike Black employees terminated during recent reorganizations, IBM leadership offered opportunities to South Asian employees to quietly shift to new roles when their previous roles were eliminated.

59. For instance, in January 2025, Ms. Bhagavan—like Mr. Nirmal, of South Asian descent—was able to move from her eliminated role of Director of Software Engineering to Director of Worldwide Customer Success, Automation Global Sales.

60. Also in January 2025, another South Asian employee, Parul Mishra, was able to move from her eliminated role as Vice President of Product Management to a Vice President of

Global Sales role.

61. As with Ms. Merali's replacement of Plaintiff, this strategic maneuvering often displaced Black employees.

62. For example, when Defendant terminated Vice President of MultiCloud Platforms Alan Bivens in January 2025, two employees of South Asian descent took over his position.

63. One week after the January 2025 termination of another African American female executive employee, Defendant replaced that Black female executive with an Asian female.

64. The decision to replace the Black female executive was made in large part by Ritika Gunnar (South Asian), who had stated openly that she believed the African American female was only in her position because of "who she knew." This statement showed clear bias and a lack of respect for the decades-long successful career of a Black female executive.

**DEFENDANT'S JUSTIFICATION FOR TERMINATING PLAINTIFF IS NOT CREDIBLE**

65. In particular, while Defendant claims it chose Ms. Merali over Plaintiff purportedly because Ms. Merali had experience in both product development and product management and Plaintiff had experience only in product development, Defendant ignored the fact that Plaintiff also had product management experience in addition to her product development experience.

66. Plaintiff had this experience from her work on the Brand team and in her work across multiple modalities for Business Automation. Indeed, product management was so fundamental to Plaintiff's most recent roles at IBM that in 2023 Defendant asked her to participate in a product management training.

67. Although Plaintiff excelled in product development, product management was a key aspect of her work, and she worked hand in hand with product management teams to build out strategy, development, design, and research.

68. Moreover, Ms. Merali's command of product management itself was subpar. In her previous role as Vice President of Product Management and Data Management, Data & AI, she struggled to lead her product management team—so much so that Plaintiff was forced to split her developers' time between development and product management to avoid unacceptable inefficiencies.

69. Ms. Merali's product management team was one of the weakest in the organization and was notorious for holding up deliverables.

70. In contrast to Plaintiff's experience in both product development and product management, product management executives such as Ms. Mirali did not similarly have such substantial expertise with product development.

71. In short, although Plaintiff's product development work often included product management work, the same is not true of Ms. Mirali's product management work, which did not likewise encompass product development.

72. The same holds true with IBM's unsupported assertions regarding the relative performance of Ms. Merali and Plaintiff, an assertion that is further undermined by IBM's concession that Plaintiff's termination was not performance-based.

**POST-TERMINATION REPUTATIONAL HARM CAUSED BY DEFENDANT**

73. IBM has not only discriminated against Plaintiff in her termination but has also exacerbated her reputational damage by allowing Ms. Loomis to spread rumors about her performance—when, again, her termination was not motivated by performance concerns.

74. Plaintiff has learned that Ms. Loomis has told multiple colleagues that Plaintiff was not performing "at the VP level" prior to her termination, something that was not documented or supported by any evidence.

75. Ms. Loomis' actively dissuaded others within IBM from considering Plaintiff for job openings or acting as a reference for her.

76. After over two decades at IBM, Plaintiff now faces an unexpected job search brought on by a discriminatory termination and made more difficult by Ms. Loomis's damage to her reputation.

77. Since her termination from Defendant, Plaintiff has not secured new employment.

## **CLAIMS**

### COUNT I
*(Violation of Title VII, 42 U.S.C. §2000e et seq.,*
*Racial Disparate Treatment – Discriminatory Termination)*

78. Plaintiff incorporates and references all of the allegations in the previous paragraphs as if they are fully restated herein.

79. Plaintiff is a member of a protected group: African American.

80. As described herein, Plaintiff was terminated from her employment, which constitutes an actionable adverse action.

81. Plaintiff asserts that she was terminated from her employment because of her race, African American.

82. Plaintiff identifies similarly-situated non-African American employees who were treated more favorably than she was.

83. Plaintiff was at least as qualified, if not more qualified than the person who replaced her, thus Defendant's proffered reason for her termination is pretextual.

84. The context of Plaintiff's termination, and that of five of seven Black executives, raises an inference that Plaintiff was terminated because of her race.

85. Defendant's actions against Plaintiff constitute a violation of the prohibition against race discrimination in Title VII.

86. Plaintiff now sues Defendant for compensation for her pain and suffering, as well as back pay, front pay, costs, fees, attorney's fees, interest and all other remedies deemed appropriate by this Court.

COUNT II
*(Violation of 42 U.S.C. §1981 et seq.,*
*Racial Disparate Treatment – Discriminatory Termination)*

87. Plaintiff incorporates and references all of the allegations in the previous paragraphs as if they are fully restated herein.

88. Plaintiff was in a contractual employment relationship with Defendant.

89. Plaintiff is a member of a protected group: African American.

90. As described herein, Plaintiff was terminated from her employment, which constitutes an actionable adverse action.

91. Plaintiff asserts that she was terminated because of her race, African American.

92. Plaintiff identifies non-African American employees who were treated more favorably than she was.

93. Plaintiff was at least as qualified, if not more qualified than the person who replaced her, thus Defendant's proffered reason for her termination is pretextual.

94. The context of Plaintiff's termination, and that of five of seven Black executives, raises an inference that Plaintiff was terminated because of her race.

95. Defendant's actions against Plaintiff constitute a violation of the prohibition against race discrimination in the 14th Amendment to the Constitution.

96. Plaintiff seeks compensation for her pain and suffering, as well as back pay, front pay, costs, fees, attorney's fees, interest and all other remedies deemed appropriate by this Court.

**JURY TRIAL DEMAND**

97. Plaintiff demands trial by jury on all claims so triable.

Dated: May 4, 2026

Respectfully submitted,

/s/*Laura Wong-Pan*
Laura Wong-Pan [LW8530]
Law Office of Laura Wong-Pan PLLC
42 Catharine Street
Poughkeepsie, NY 12601
(845) 218-1288
LWP@laurawongpanlaw.com

Pamela Keith (pro hac vice pending)
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
(202) 800-0292
pamkeith@centerforemploymentjustice.com